## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 20-CR-252-2 (VLB)** |
| | : | |
| **ISMAEL ROMAN,** | : | |
| **Defendant** | : | **February 1, 2021** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

### Ruling And Order Denying Defendant's Motion For Release On Bond

### [Dkts. 11 and 25]

Defendant Ismael Roman is currently detained pending trial for a federal drug conspiracy charge at the Hartford Correctional Center ("Hartford CC"). Pursuant to 18 U.S.C. §§ 3142 and 3145, Mr. Roman appeals a detention order issued by U.S. Magistrate Judge Robert A. Richardson. [Dkt. 11 (Def. Mem. in Supp.)]. Mr. Roman argues that he is especially susceptible to severe complications if he contracts COVID-19, that he has significant ties to the community, does not pose a flight risk, and there is insufficient evidence to demonstrate he is a current danger to the community. [*Id.*]. The Government opposes his motion. [Dkt. 22 (Gov. Mem. in Opp'n)].

The Court held an evidentiary hearing on January 8, 2021. At the conclusion of that hearing, the Court offered the opportunity for Mr. Roman to file additional information on the sureties' equity in the properties offered as proposed collateral for bond. Mr. Roman filed this supplemental information. [Dkt. 45 (Def. Suppl.)].

Thereafter, Mr. Roman informed the Court that he contracted COVID-19 and he is being quarantined at the MacDougall Correctional Institution because he is symptomatic. [*Id.*]. He requests emergency consideration and an order for his immediate release. [*Id.*]. The Court then ordered Mr. Roman to address how he proposes to quarantine and access medical treatment if he is released on bond while positive for COVID-19 and infectious. [Dkt. 46 (Order for Suppl. Briefing)]. If released, Mr. Roman proposes quarantining at his girlfriend's two-level, ranch-style home that has a separate living area. [Dkt. 47 (Def. Sec. Suppl. Br.) at 1-2]. Mr. Roman's girlfriend or her 21-year-old son would drive Mr. Roman to medical appointments. [*Id.*]. Alternatively, Mr. Roman proposes residing at his aunt and uncle's home, where he would have a separate bedroom and bathroom. [*Id.*]. Mr. Roman's aunt and uncle are working from home and could drive Mr. Roman to medical appointments. [*Id.*]. Defendant did not provide any information relating to the continuum of care for his COVID-19 infection.

Having considered the briefing and hearing testimony, the Court DENIES Mr. Roman's motion for pre-trial release.

## Analysis

### I.  Legal Standard

Pursuant to 18 U.S.C. § 3145(b), "[i]f a person is ordered detained by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or

amendment of the order. The motion shall be determined promptly." This requires this Court to conduct a de novo review of a magistrate judge's detention order. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

A defendant may be detained pending trial only if the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e)(1). Thus, the default rule is that defendants awaiting trial be released.

"Because the law thus generally favors bail release, the government carries a dual burden in seeking pre-trial detention." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). The Government must establish that the defendant is an actual flight risk and then establish that no set of conditions would reasonably assure his presence in court. *Id.* (citations omitted). Alternatively, "[t]o order detention, the district court must find, after a hearing, that the government has established the defendant's dangerousness by clear and convincing evidence," notwithstanding proposed conditions of pretrial release. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (citing 18 U.S.C. § 3142(f)).

However, if the court finds there is probable cause that a defendant committed a class of offenses detailed in 18 U.S.C. § 3142(e)(3), a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the appearance of the person and the safety of any other person and the community. *Id.* "[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of

3

triggering the rebuttable presumption set forth in § 3142(e)." *United States v.*
*English.* 629 F.3d 311, 319 (2d Cir. 2011). "In a presumption case such as this, a
defendant bears a limited burden of production—not a burden of persuasion—to
rebut that presumption by coming forward with evidence that he does not pose a
danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d
433, 436 (2d Cir. 2001). "Once a defendant has met his burden of production ... the
presumption favoring detention does not disappear entirely, but remains a factor
to be considered among those weighed by the district court. Even in a presumption
case, the government retains the ultimate burden of persuasion by clear and
convincing evidence that the defendant presents a danger to the community." [*Id.*].

The factors that the court must consider "in determining whether there are
conditions of release that will reasonably assure the appearance of the person as
required and the safety of any person and the community," are:

> (1) the nature and circumstances of the offense charged, including
> whether the offense is a crime of violence, . . .or involves . . . a
> controlled substance, . . .;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person, including - -

>> (A) the person's character, physical and mental condition,
>> family ties, employment, financial resources, length of
>> residence in the community, community ties, past conduct,
>> history relating to drug or alcohol abuse, criminal history, and
>> record concerning appearance at court proceedings; and

>> (B) whether, at the time of the current offense or arrest, the
>> person was on probation, on parole, or on other release pending
>> trial, sentencing, appeal, or completion of sentence for an
>> offense under Federal, State, or local law; and

**(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.**

18 U.S.C. § 3142(g).

"The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. § 3142(f).

### I.    Case Background

Mr. Roman was arrested pursuant to a criminal complaint and indicted shortly later for conspiracy to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii), and 846. If convicted, the Controlled Substances Act provides that the offense is punishable by a mandatory minimum sentence of 10 years imprisonment and a maximum sentence of life imprisonment. 21 U.S.C. § 841(b)(1)(A)(ii). Thus, there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3)(A) that no condition or combination of conditions will reasonably assure the appearance of the person and the safety of any other person and the community. The Court now turns to the nature and circumstances of the offense and the Government's evidence.

The following facts are taken from DEA Task Force Agent Jeffrey Poulin's affidavit in support of the arrest and search warrants for Mr. Roman and his co-defendants, Angel Luis Rodriguez and Chris Walker. [Dkt. 1-1 (Poulin Aff.)]. The Defendant is presumed innocent and the Court does not adopt these allegations as true. It is "contrary to our legal system to impose punishment for a crime that a

defendant has not yet been shown to have committed, [thus] courts are cautious in affording undue weight to this factor." *United States v. Boustani*, 356 F. Supp. 3d 246, 253 (E.D.N.Y. 2019), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019). The strength of the Government's case and the seriousness of the potential penalty are factors because they increase a defendant's incentive to flee or to commit further crimes before being potentially subject to a lengthy period of imprisonment. *United States v. Bruno*, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015).

The Government alleges that Mr. Rodriguez operated a drug trafficking organization with the assistance of Mr. Roman, their co-defendant Chris Walker, and several unindicted co-conspirators. The drug trafficking organization allegedly obtained multi-kilogram quantities of cocaine from Mexican sources in California for redistribution in Connecticut on a bi-weekly basis. [Dkt 1-1 (Poulin Aff.) ¶¶ 32-33, 45-46, 63].

Operating on information from a confidential source from outside of the jurisdiction, an undercover officer conducted a cash pick up of narcotics proceeds from Mr. Rodriguez and an unidentified associate. [*Id.* ¶¶ 5-9]. About three months later, in April 2018, the same undercover officer conducted a controlled cash pickup from Mr. Roman, where the officer received $130,950. [*Id.* ¶ 10]. Mr. Roman was driving a grey Acura, but surveillance units lost site of the vehicle in East Hartford. [*Id.* ¶ 10]. Police ascertained Mr. Roman's address and observed the grey Acura there, close to where police lost contact with the vehicle after the controlled pickup. [*Id.* ¶¶ 12-13]. The undercover officer later identified Mr. Roman from a photograph as the man that delivered the money. [*Id.* ¶ 13]. Based on social media

photographs of Mr. Rodriguez and Mr. Roman appearing together, police surveillance, information from cooperating sources, and cell phone location data from Mr. Rodriguez's phone, police inferred that Mr. Rodriguez and Mr. Roman were close associates. [*Id.* ¶¶ 13, 16].

On May 1, 2019, police followed Mr. Rodriguez to an apartment complex where they believed that Israel Rivera, an unindicted co-conspirator, maintained a stash house. [*Id.* ¶ 17]. Mr. Roman arrived thereafter. [*Id.* ¶ 18]. Mr. Roman and Mr. Rodriguez separately entered the building and then exited together, before Mr. Rivera arrived. [*Id.* ¶¶ 17-19]. As he exited the building with Mr. Rodriguez, Mr. Roman was carrying a black nylon bag. [*Id.* ¶ 19]. Mr. Rodriguez drove away, but Mr. Roman remained in his vehicle until Mr. Rivera arrived about fifteen minutes later. [*Id.* ¶ 20]. Mr. Rivera exited his vehicle and spoke to Mr. Roman, who was still seated in his car. [*Id.*].

Police then stopped Mr. Roman's car and he consented to a search, which resulted in the discovery of $26,995 in a black draw string bag on the floor of the rear passenger's side of the car. [*Id.* ¶¶ 21-23]. A trained police K-9 arrived on scene and alerted to the presence of narcotics odor on the driver's side door handle, the passenger compartment, and on the nylon bag. [*Id.* ¶ 24]. Task Force Officer Poulin questioned Mr. Roman during the traffic stop. [*Id.* ¶ 25]. Mr. Roman claimed that the money was for a gambling debt owed to him by "Jose" from a bodega but could not provide any corroborating details and denied knowing Mr. Rivera when confronted with the officer's observation. [*Id.* ¶ 25].

Police then conducted a consent search of Mr. Rivera's apartment. [*Id.* ¶¶ 26-27]. Police discovered $1.1 million in eleven heat sealed packages in the bathtub in the master bathroom. [*Id.* ¶ 28]. A trained police K-9 alerted to the presence of narcotics odor on the packaging. [*Id.*]. Police also discovered a drug ledger and packaging materials. [*Id.* ¶¶ 28-29]. Mr. Rivera stated that he grew up with Mr. Roman, denied that Mr. Roman had a key to his apartment, and claimed that a man named "Jose" let him in, but he did not know Jose's name, although he claimed that Jose had a key to his apartment. [*Id.* ¶ 30].

In addition to the cash pick up and seizures, the Government also relies on information from several confidential informants to connect Mr. Roman to the alleged narcotics conspiracy.  Task Force Officer Poulin swears that information from Confidential Source #3 "has been independently corroborated by investigators and is believed to be truthful, credible and reliable. [Confidential Source #3] is cooperating in the hopes of receiving favorable consideration in connection with pending narcotics trafficking charges." [*Id.* ¶ 38]. Confidential Source #3 claims to have initially transported marijuana for the drug trafficking organization and that Mr. Roman always handled money for Mr. Rodriguez. [*Id.* ¶ 37]. Sometime before 2017, Confidential Source #3 claims that Mr. Roman and Mr. Rodriguez flew to California to consummate a 14-kilogram cocaine deal that the confidential source orchestrated. [*Id.* ¶ 38]. The confidential source alleges to have turned drugs over to Mr. Roman when they arrived in Connecticut on two occasions. [*Id.* ¶¶ 38-39]. The confidential source stated that, in approximately 2017, Mr. Roman provided him or her and their cousin with $120,000 to purchase

90 pounds of marijuana in California. [*Id.* ¶39]. After police seized $60,000 from the confidential source's cousin at the airport, the source claims that Mr. Roman transported the money himself. [*Id.*].

Confidential Source #4, whom the affiant states has provided information that "…has been independently corroborated by investigators and is believed to be truthful, credible and reliable…in the hopes of receiving favorable consideration in connection with pending narcotics trafficking charges," was a truck driver that transported cocaine and cash for Mr. Rodriguez cross-country. [*Id.* ¶¶ 43-46]. The confidential source claims that Mr. Rodriguez and Mr. Roman supplied him or her with a "burner phone" and required them to travel with Alex Huertas, a truck driver and unindicted co-conspirator. [*Id.* ¶ 45]. The money was stored in heat sealed packages that were the size of books, hidden under the bed in the tractor. [*Id.*]. The confidential source claims that he brought the cocaine to Mr. Rodriguez and Mr. Roman at Mr. Huertas's towing shop. [*Id.* ¶ 46]. Confidential Source #4 estimates that he transported at least 10 kilograms and at the most more than 30 kilograms of cocaine every two to three weeks until April 2019. [*Id.*]. The confidential source estimated that the size of the loads increased over time. [*Id.*]. Confidential Source #4 claims that the drug trafficking organization was robbed of a large amount of cash and a multi-kilogram quantity of cocaine. [*Id.* ¶ 47]. The confidential source was supplied a new mobile phone for each trip, as were Messrs. Rodriguez, Roman, and Huertas. [*Id.*]. They communicated with each other using mobile applications and pre-programmed names. [*Id.*].

## (1) The nature and circumstances of the offense charged, § 3142(g)(1)

9

Mr. Roman does not raise any arguments to refute the seriousness of the offense charged. As the Second Circuit stated in *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000) "[i]n our view, the Supreme Court's words in context say nothing more than that "crimes of violence," high penalty drug crimes, and offenses punishable by death or life imprisonment are among "the most serious," and that Congress limited detention eligibility to these categories." (citing *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Because Mr. Roman is charged with a serious drug crime, Section 3142(g)'s first factor counsels against his release. *See e.g. United States v. Hempstead*, No. 3:15-CR-117 (VAB), 2017 WL 71653, at *2 (D. Conn. Jan. 6, 2017). The sheer quantity of drugs allegedly trafficked by the organization and Mr. Roman's alleged role in handling large sums of narcotics proceeds demonstrates the exceptionally serious nature of the offense as alleged.

### (2) The weight of the evidence against Mr. Roman, § 3142(g)(2)

Next, the Court considers the weight of the evidence against Mr. Roman. § 3142(g)(2). The parties may present or rebut evidence by proffer, given the informal and preliminary stage of the proceeding. *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000).

The Government's memorandum principally relies on the affidavit of Task Force Officer Poulin as summarized above. [Dkt. 22 (Gov. Mem. in Opp'n) at 20-21]. For the purposes of determining whether Mr. Roman should be detained pending trial, the Government has adduced sufficient factual allegations to show that Mr. Roman occupied a position of trust in a drug trafficking organization that is alleged

to have dealt in kilogram quantities of cocaine, millions of dollars in drug proceeds, and employed sophisticated means to evade detection.

In opposition, Mr. Roman argues "the only allegations arise from activity on or before May 1, 2019, when Mr. Roman was observed in the parking lot of an apartment complex with money, no drugs. Subsequently, officers stopped Mr. Roman's car, on questionable grounds, merely because he was driving in the vicinity of the apartment complex. The only other source of government information was from unidentified informants who appear to be from the criminal underworld." [Dkt. 23 (Def. Repl. Br.) at 1-2]. Mr. Roman also challenges the Government's assertion that the drug trafficking organization used sophisticated means because it is undercut by their ultimate detection by law enforcement. [*Id.*]. Additionally, during the evidentiary hearing, defense counsel proffered that the undercover officer's identification of Mr. Roman as the man who dropped $130,950 in cash is unreliable because it was based on a single motor vehicle registry photograph of Mr. Roman, presented nearly a year later. [Evid. Hearing Audio at 2:20:32-2:21:47].

Although the Government's evidence is far from impregnable, it stems from varied sources, including: a controlled drop-off of $130,950 by Mr. Roman to an undercover police officer, his close association with Mr. Rodriguez, police surveillance placing him at Mr. Rivera's apartment with Mr. Rodriguez and the seizure of $1.1 million from the apartment and $26,995 from the bag that Mr. Roman was seen exiting the apartment with, and multiple confidential sources that implicate Mr. Roman in the handling of narcotics proceeds or accepting the

11

delivery of drugs. Even if the undercover officer's identification of Mr. Roman as the man who dropped off the cash is unreliable, the officer identified Mr. Roman's automobile, which was also seen at Mr. Rivera's apartment the day of the seizure and was identified by other confidential informants. Finally, Mr. Roman's denial that he knew Mr. Rivera was not credible and is suggestive of wrongdoing. It also tends to show Mr. Roman would not be amenable to supervision.

Mr. Roman's attack on the reliability of the confidential informants is conclusory and relies solely on their status as either criminal defendants or the subject of criminal investigations to undermine their credibility. However, Task Force Officer Poulin's affidavit states that several of the confidential sources who provided their personal knowledge of Mr. Roman's alleged trafficking activities provided information that was "… independently corroborated by investigators and is believed to be truthful, credible and reliable." [Dkt. 1-1 (Poulin Aff.) ¶ 36 (Confidential Source No. 3), ¶ 43 (Confidential Source No. 4)]. Informants known to the Government are more reliable than anonymous tipsters. *See generally Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir.2002) (considering known informants generally to be more reliable than anonymous informants (*citing Florida v. J.L.*, 529 U.S. 266, 270 (2000)).

The Defendant's argument that, since the drug trafficking organization was eventually caught, their means must have been unsophisticated, misses the mark. The purpose of the inquiry into the circumstances of the alleged criminal conduct is to determine whether the Defendant poses a danger to the public or is a flight risk while awaiting trial. 18 U.S.C. § 3142(g)(1). The fact that the Defendant is alleged

12

to have communicated using pre-programed third-party mobile applications on a new mobile phone after each transaction demonstrates an effort to evade detection. This poses the risk of frustrating the ability of Pre-Trial Services to successfully monitor the Defendant to assure that he does not engage in trafficking activities while subject to the conditions of pre-trial release.

Moreover, the allegations, if established, would show that Mr. Roman played an important role in managing the drug trafficking organization's financial affairs. It would further show that the organization had the resiliency to withstand the police seizure of $1.1 million and the loss of narcotics and cash to a robbery while continuing to operate on a multi-kilogram scale. This suggests that law enforcement efforts were initially unsuccessful at preventing, or at least deterring further criminal activity. The transactions were also allegedly carried out by other means, including the use of multiple stash houses, rental vehicles and telephones registered in other individuals' names, truck drivers riding in tandem, the use of multiple couriers, and heat-sealed packages of cash hidden in compartments. These allegations stand in marked contrast to the typical narcotics distribution case in this District involving networks of street level dealers and their distributors operating in the confines of their neighborhood.

As to the relative remoteness of Mr. Roman's alleged criminal conduct, the Court finds that this factor does not sway the analysis as to the nature of the offense or the weight of the evidence relative to Mr. Roman's risk to the public or the likelihood of flight. Mr. Roman does not point to any evidence suggesting that

he withdrew from the alleged conspiracy. *See United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002).

The Court finds that, considering the gravity of the criminal conduct alleged and the totality of evidence that the Government could muster, which is strong but not insurmountable, a defendant in Mr. Roman's position would have an incentive to flee or to engage in trafficking activities before a potentially lengthy period of imprisonment.

The Court must also consider the seriousness of the risk of Defendant's potential harm to the public if released. 18 U.S.C. § 3142(g)(4). The Government argues that cocaine trafficking severely impacts many communities and devastates lives. [Dkt. 22 (Gov. Mem. in Opp'n) at 22-23]. Defendant does not offer any arguments to rebut the seriousness of the potential harm caused by drug trafficking.

The Government also argues Mr. Roman has a strong incentive to reengage in drug trafficking. The Government posits the drug trafficking organization will be pressured to reengage in trafficking because of the loss of 15 kilograms of cocaine to the police seizure in December 2020, which was purchased on credit. [*Id.* at 23]. In addition, the sizable cash seizures represent losses which may incent a drug trafficker to attempt to recoup these losses by engaging in illegal activity. The Government argues Mr. Roman is in partnership with the leader of the drug trafficking organization and thus needs to make up the losses. The Court concludes that, the pressure from the seizures, including the December 2020

14

seizure, creates a serious risk that Mr. Roman could harm the community by engaging in high-volume trafficking activities, particularly since he faces a long period of incarceration if convicted.

Accordingly, the Court finds that Section 3142(g)'s second and fourth factors counsel against Mr. Roman's release. Having addressed the scope of the allegations and the factual support adduced by the Government at this preliminary stage of the proceeding, the Court now turns to Mr. Roman's personal characteristics, his health and the conditions at his place of detention, and the adequacy of his proposed bond package.

II.   <u>Mr. Roman's History and Characteristics</u>

Mr. Roman is 41 years old and is a lifelong Hartford resident. [Pre-Trial Services Bail Report at 1]. He has a young daughter and his family ties to the area are a factor favorable to pre-trial release. 18 U.S.C. § 3142(g)(3)(A).

His employment history and financial condition is more problematic. Mr. Roman formerly worked for Huertas Towing from 2015 to 2016, which is owned by Mr. Roman's alleged unindicted co-conspirator and the alleged rendezvous point for drug distribution. [Dkt. 1-1 (Poulin Aff.) ¶ 47]. Mr. Roman stated that he was then self-employed as a carpenter and then hurt his foot but could not provide any corroborating information. [Evid. Hearing Audio at 1:59:16-2:00:08]. At the time of his arrest, he claimed to be self-employed as a t-shirt printer for over a year. [Pre-Trial Services Bail Report at 1]. However, he has no income, customers, raw material, or inventory. [Evid. Hearing Audio at 2:01:02-2:01:06].

Mr. Roman resided with his girlfriend and proposed surety who works as a teller and earns $600 per week and they pay $1,750 per month in rent. [Pre-Trial Services Bail Report at 2]; *but see* [Evid. Hearing Audio at 1:50:27](Test. of L. Salazar to earning $650 bi-weekly). The amount of cash seized from Mr. Roman in May 2019 and the amount he allegedly delivered to an undercover officer in April 2018 far exceeds Mr. Roman's modest assets and his girlfriend's earnings. This poses a risk that he would engage in trafficking activities or access trafficking proceeds because of financial pressure.

Mr. Roman has three prior state drug felony convictions. Mr. Roman was on state probation when he committed his second and third felonies. Mr. Roman was convicted, twice, of operating under the influence after serving two custodial jail sentences. [Pre-Trial Services Crim. Hist. Report]. Additionally, according to the indictment, the drug conspiracy began in 2017, and Mr. Roman was on probation for his second operating under the influence conviction through October 2017. See [*Id.*]; [Dkt. 17 (Indictment) ¶ 1]. The Defendant's criminal history, although dated, shows an increased risk for re-engagement in drug trafficking and the possibility that he would violate conditions of release because he has disregarded court orders in the past. Considering the age of the convictions and the limited evidence alleging criminal activity by Mr. Roman prior to October 2017 when his state probation ended, the Court places less weight on these two factors, but they nevertheless counsel in favor of pre-trial detention.

The Court considers the Defendant's health. The Court agrees with the Defendant's contention that his established pre-existing medical conditions place

him at a recognized risk of severe illness from COVID-19. For the last several months, the CDC has classified underlying health conditions that correlate to an increased risk of severe complications from contracting COVID-19 into two categories; conditions that are known to cause an increased risk of severe illness and those that might increase a person's risk. *People with certain medical conditions*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 29, 2020). The conditions listed are regularly updated as the CDC reviews new scientific research. *Id.*

Mr. Roman's medical records show that he is diagnosed with Type 2 diabetes mellitus and morbid obesity, both of which place him at risk of severe complications from the virus. [Dkt. 33 (Sealed Med. R.) at 3]. Mr. Roman's liver disease, hypertension, and possibly his asthma, place him at a potentially heightened risk for severe complications under the most recent CDC guidance. [*Id.*]. The potential health risks posed to Mr. Roman from complications caused by his other health conditions, like sleep apnea, are more nebulous. *See, e.g.* [Bond Evid. Hearing Audio at 41:42-42:00](Test. of Dr. Byron Kennedy as to whether sleep apnea increased the likelihood of an adverse outcome from COVID-19).

Mr. Roman subpoenaed Dr. Byron Kennedy, MD, Ph.D, MPH, the Chief Medical Officer for the Connecticut Department of Correction ("DOC") to testify under oath at the January 8, 2020 detention hearing. Dr. Kennedy testified that, as compared to the general population, DOC inmates and detainees have a higher infection rate than the general population, as calculated by the cumulative total

number of positive cases divided by the average daily census. [*Id.* at 12:18-22:00]. Dr. Kennedy estimated that, daily, 10-15% of DOC inmates and detainees are positive for COVID-19, which includes asymptomatic infections detected through mass testing. [*Id.* at 21:37-22:19]. Dr. Kennedy testified that an individual with risk factors for severe complications from COVID-19 would be at risk regardless of whether they resided in a custodial setting or at liberty. [Evid. Hearing. at 1:13:07-1:13:54].

Dr. Kennedy testified extensively about the DOC's monitoring and treatment protocol for inmates who are symptomatic for COVID-19. Correctional nurses monitoring COVID-19 positive inmates and detainees can triage patients that need a higher level of care because of the close monitoring. [*Id.* at 25:10-25:27]. Dr. Kennedy explained that most of the published literature on COVID-19 concerns patients who are hospitalized or require care in the intensive care unit. He testified that the DOC is "not a hospital, but we're not exactly a doctor's office because in a doctor's office you do not have patients that remain their 24/7...[or] nursing available 24/7." [*Id.* at 28:58-29:16]. Dr. Kennedy explained that the primary care provider at each DOC correctional institution or detention center could decide to temporarily transfer a symptomatic COVID-19 patient to the DOC's dedicated COVID-19 unit in the medical wing at the MacDougall-Walker Correctional Institution for a higher level of care. [*Id.* at 51:30-55:11]. The unit can provide a patient with supplemental oxygen, but a patient requiring intubation would require transfer to a hospital. [*Id.* at 58:24-59:11].

After the hearing, Mr. Roman tested positive for COVID-19. [Dkt. 45 (Def. Suppl. Br.) at 1]. He is now symptomatic. He was transferred to the COVID-19 unit at MacDougall-Walker Correctional Institution, where he will receive close monitoring by nursing staff and immediate access to potentially life-saving medical intervention should his condition deteriorate. Based on Dr. Kennedy's extensive testimony about the medical care available for mild to moderate COVID-19 patients in DOC custody, the Court cannot conclude that Mr. Roman's health is in a more precarious state because he is in custody.

In light of these protective measures and Mr. Roman's health, the Court finds that, at this time, the COVID-19 pandemic does not provide a compelling reason to release Mr. Roman.

Having contracted the virus, Mr. Roman likely has some degree of immunity. As a result, he is even more inclined to circulate in the community and reengage in criminal activity than he would if he feared contracting a potentially deadly case of the virus. In addition, although the Government has not raised this as a concern, having experienced the deprivations of custody, he is more inclined to flee the jurisdiction.

III.   **Adequacy of Mr. Roman's proposed conditions of pretrial release**

Mr. Roman proposes to be released on a $100,000 surety bond, he asks to live with his girlfriend in East Hartford, the bond would be co-signed by his girlfriend and his aunt and his uncle, and he would comply with any additional court-ordered conditions, including electronic monitoring. [Dkt. 11 (Def. Mem. in

19

Supp.) ¶¶ 2-3, 9]. After contracting the coronavirus, Mr. Roman persisted in his desire to be released to live with family members.

In his reply brief, Mr. Roman proposes limiting travel to "religious, legal, medical, and childcare related matters," without any additional specificity about the likely frequency and duration of travel. [Dkt. 23 (Def. Mem. in Supp.) at 4]. Mr. Roman proposes home confinement with liberal leave to be absent from the home throughout each day on an unscheduled basis. Mr. Roman's proposal is so porous as to impose no meaningful detention. Further, the porosity of the terms of home confinement make it impossible to verify his compliance or monitor or restrict his whereabouts.

The property appraisals and results of a title search filed by Mr. Roman's counsel demonstrates that his proposed sureties have enough equity in their properties to collateralize the proposed bond he offers. [Dkt. 45-1]. However, the value of the collateral is not the only consideration. The Court must weigh whether the value of the collateral is sufficient to deter the defendant from engaging in criminal activity and fleeing the jurisdiction. The proposed collateral pales by comparison to the large amount of cash seized during this drug conspiracy. Consequently, that amount could be recouped readily by reengaging in the charged drug activity, rendering it inadequate.

Where the collateral is posted by third parties, the Court must also consider whether the consequences of violating conditions of release on the sureties would deter Defendant. Rather than convalescing in the DOC's dedicated COVID ward

where he would benefit from monitoring and treatment by medical staff, he proposes to be immediately released and to reside with his girlfriend, their young daughter, and his girlfriend's son or his aunt and uncle. [Dkt. 47 (Def. Resp. to Court Order No. 46]. He would rely on them for transportation to medical appointments. [*Id.*] While he states that he would have a separate living space under either arrangement, the proposals risk exposing his proposed sureties and the community to the virus, particularly while he is contagious and symptomatic and would rely on them for transportation.  The question of a bond package is not only whether others are willing to act as sureties, but also whether a defendant cares about his sureties: the fact that sureties are willing to put up their property as collateral does not matter if a defendant does not care if the surety loses their house. Mr. Roman's willingness to expose them to the virus to secure his liberty raises a concern with the Court as to whether he would be equally willing to expose them to the devastating financial consequences should he breach the conditions of bond.  The Court also questions whether the loss of the pledged property would be devastating.

On another note, the separate living quarters would frustrate his custodian's ability to monitor him, particularly at his girlfriend's home which has a separate entrance to Mr. Roman's proposed quarters. Aside from her logistical ability to monitor him, the Court questions his girlfriend's willingness to supervise him.  The Court notes that Mr. Roman resided at his girlfriend's home while allegedly engaged in the multi-year drug conspiracy during a time when he had minimal

reported income, which gives the Court pause as to her suitability as his potential third party custodian.

As to the potential risk mitigation provided by electronic monitoring, the Government argues that "[w]hile there may have been a time where home confinement reasonably would have mitigated such a risk, the modern technological age of prepaid phones and encrypted communication applications does not offer the same degree of comfort. A defendant bent on resuming drug trafficking can easily do so by communicating with associates within the confines of his own home and by operating from his residence." [Dkt. 22 (Gov. Mem. in Opp'n) at 24]. The Government cites *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) for the proposition that "electronic surveillance systems can be circumvented by the wonders of science and sophisticated electronic technology and monitoring equipment can be rendered inoperative." The Court agrees. Home confinement and electronic monitoring do not "eliminate the danger that [a defendant] w[ill] engage in further sale of narcotics by telephone with a willing collaborator." *United States v. English*, 629 F.3d 311, 322 (2d Cir. 2011) (internal quotation marks omitted).

Here, there is a particularized risk that the Defendant would use a disposable mobile phone with an encrypted communications application secreted to him by a confederate while the Defendant is in the community, which would enable him to engage in drug trafficking activities while evading detection by authorities.

The Government has established by clear and convincing evidence that no combination of conditions of pre-trial release would sufficiently protect the public considering the serious drug charges that Defendant is facing, his personal characteristics, and the incentive and ability to reengage in dangerous drug trafficking while pending trial.

Considering this ruling, the Court need not decide whether Defendant also poses a flight risk, which the Government has not briefed.   However, the heightened risk attendant to the lengthy sentence Defendant faces is exacerbated by Defendant's recent detention during the pandemic. His willingness to risk the health, and possibly the lives, of his loved ones suggests a desperation to avoid incarceration sufficient to make him a flight risk.

Accordingly, the narrow conditions precedent to pretrial detention as set forth in the Bail Reform Act, § 3142(e), are satisfied. The Court orders Mr. Roman detained pending trial.

## IV.    Constitutionality of Mr. Roman's detention

Mr. Roman also argues that the U.S. Constitution requires his release, although he does not specify the procedural mechanism through which he invokes his constitutional rights. Prior to contracting COVID-19, the Defendant argued that "[i]n light of the pandemic and serious co-morbidity health problems detailed in Mr. Roman's motion for release, his pretrial detention also constitutes a substantive due process violation, by placing him in a life-threatening situation." [Dkt. 23 (Def. Repl. Br.) at 3](citing *Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979). The Fifth

Amendment Due Process Clause right against pre-trial punishment is an omnipresent consideration. U.S. CONST. AMEND. V; *see Bell*, 441 U.S. at 561; *see also Salerno*, 481 U.S. at 746 ("As an initial matter, the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment.")(citing *Bell* in upholding the constitutionality of the Bail Reform Act).

Here, to establish a due process violation under the Fifth Amendment, a federal pretrial detainee must establish: "objectively, the alleged deprivation must be sufficiently serious." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). Second, "subjectively, the charged official must act with a sufficiently culpable state of mind." *Id*. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)(Eighth Amendment deliberate indifference test would be applied to pre-trial detainee's Fifth Amendment due process claim challenging denial of estrogen treatments).

Neither of the two exhibits Defendant filed provides persuasive support for his substantive due process argument. [Dkt. 38]. Defendant filed a copy of the expert Declaration of Dr. Jaimie Meyer, Assistant Professor of Medicine at the Yale School of Medicine dated April 24, 2020, filed in the matter of *Martinez-Brooks et al. v. Easter et al.*, 3:20-cv-569. [Dkt. 38-1 (Meyer Decl.)]. Dr. Meyer asserts that,

given that COVID-19 spreads through exposure to respiratory droplets and to a lesser degree on inanimate surfaces, prisons and jails are a "tinderbox" for contagion because persons in custody cannot socially distance and hygiene and cleaning protocols are inadequate. [Dkt. 1-1 (Meyer Decl.) ¶¶ 20-25, 29]. Dr. Meyer stated that "[j]ails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks. Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases." [*Id.* ¶ 14]. She predicted that prisoners would be unable to access intensive medical care at hospitals because hospitals will be over capacity. [*Id.* ¶ 16]. She predicted that prisoners will be unable to access timely treatment for pre-existing physical and mental health conditions, which may be "traumatizing, compounding the trauma of incarceration." [*Id.* ¶ 38]. She advocates for reducing the prison population by releasing those who can "safely and appropriately remain in the community" and evaluating detained individuals for release, particularly those with pre-existing chronic health conditions. [*Id.* ¶¶ 39-40].

With due respect to Dr. Meyer's qualifications as an expert in correctional medicine and infectious diseases and the early stage of the pandemic when she authored her declaration, her dire, sweeping, and generalized predictions have not come to fruition in the facilities in which detainees of this district are in custody. Her declaration addresses prison conditions generally and conditions at FCI Danbury in the early weeks of the pandemic. It offers no analysis of current or

historical conditions at the Connecticut Department of Correction where Mr. Roman is housed.

Defense counsel called Dr. Kennedy, the Chief Medical Officer of the Department of Corrections ("DOC)", who testified about the historical and current conditions at the DOC. Dr. Kennedy testified that he received a copy of Dr. Meyer's declaration from defense counsel the day of the evidentiary hearing but had not yet reviewed it. [Evid. Hearing Audio. at 09:52-10:10]. Dr. Kennedy testified that he agreed with Dr. Meyer's opinion that there is a significantly higher risk of transmission of the virus in a congregate setting, like a prison or jail, than in the general public. [*Id.* at 13:18-13:34]. Moving beyond generalities to the specific facts relevant to the Court's decision about Mr. Roman's motion, Dr. Kennedy's opinion supported by relevant facts undermined Dr. Meyer's prediction.

When asked about Dr. Meyer's predictions, Dr. Kennedy testified that early in the pandemic, there were no national guidelines for treating COVID-19 patients in a correctional setting and the DOC adapted quickly and successfully by creating a recovery center, which improved outcomes. [*Id.* at 26:43-29:56]. Dr. Meyer's general claim that prisons and jails lack 24-hour medical staff and sufficient resources to detect positive cases and treat those infected is directly refuted by Dr. Kennedy's more specific testimony that, currently at the DOC, these resources are available and are being successfully utilized for the benefit of inmate health. *See supra.* at 17-18.

According to regularly updated data on the DOC webpage which both parties cite, over 92% of inmates who were infected with COVID-19 have recovered. Health Information and Advisories (table), Conn. Dep't. of Correction, https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last updated Jan. 29, 2021). Of those currently infected, about a quarter are in the specialized COVID-19 infirmary and two thirds are asymptomatic. Not to undermine the loss of any life, 19 prisoners died and 5 remain hospitalized. *Id.* This equates to a case fatality rate of 0.5%, as compared to the State of Connecticut's case fatality rate of 2.82%. *See Id.*; see also Health, *Coronavirus Disease 2019 (COVID-19),* Conn. Dep't. of Pub. Health https://portal.ct.gov/coronavirus, (last updated on Feb. 01, 2021). Dr. Kennedy testified that the case fatality rate is used as a benchmark for quality of care for a health system because it reflects at least one contact with the health system. [*Id.* at 23:38-25:00]. The Court and Dr. Kennedy agree that the case fatality rate is an imperfect measure because age has been a critical factor in mortality from COVID-19 and the DOC's population is younger than the state population. [*Id.* at 25:00-25:05]. Nevertheless, the DOC's case fatality rate demonstrates that the DOC has not abandoned its responsibility to treat inmates or, contrary to Dr. Meyer's prediction, that the correctional healthcare system would be overrun by an influx of critically ill inmates, resulting in poor health outcomes.

As Dr. Kennedy testified, a prisoner will suffer from the co-morbidities that elevate their risk of severe complications or death from the virus regardless of whether they are in custody. [Evid. Hearing. at 1:13:07-1:13:54]. Dr. Meyer's

declaration assumes the worst; it offers no insight into how medically vulnerable prisoners would fare in their communities, where the virus is present, in some cases rampant, and were they lack 24-hour access to specialized nursing care, and in some cases, access to even basic healthcare.

Judge Shea's decision granting temporary injunctive relief for federal prisoners incarcerated at FCI Danbury is not persuasive legal support for Defendant's argument that his pre-trial detention would violate his constitutional rights. The issue in *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411 (D. Conn. 2020) largely centered on whether the warden of FCI Danbury was utilizing newly expanded authority to increase the number of prisoner's designated to home confinement and to expedite requests for the BOP to file compassionate release motions on their behalf. *See id.* at 447. The case is distinguishable in at least two respects. First, Mr. Roman has not established how his conditions of confinement or the availability of adequate medical treatment in DOC custody is comparable to conditions at FCI Danbury in the early months of the pandemic, when less information was known about treatment measures and there were critical shortages of supplies.  Second, the issue before the Court here is whether the Defendant should be detained pending trial and his assertion that the conditions of detention are currently unconstitutional. Here, unlike *Martinez*, there is no claim that officials at the DOC are failing to use statutory authority and executive authorization as an appropriate means of mitigating his risk from COVID-19. Therefore, *Martinez* is not persuasive. Nor is there any claim that Mr. Roman is being or would be denied efficacious medical care. On the contrary, Dr. Kennedy's

28

testimony described a treatment modality better than that which Mr. Roman would receive living in a private residence without available 24-hour medical care from medical staff experienced in treating patients with COVID-19 available at the DOC.

Here, on this record, the Court cannot conclude that Mr. Roman's pre-trial detention itself poses an unreasonable risk of serious damage to his health given the prevalence of the virus in the community. Mr. Roman has not alleged any facts suggesting that the DOC acted in an objectively reckless manner in failing to reasonably mitigate against contagion or treating those infected.

Mr. Roman also argues that his detention during the pandemic has limited his attorney-client communications. [Dkt. 23 (Def. Repl. Br.) at 3]. The Second Circuit has determined that a pretrial detainee's Sixth Amendment rights are infringed upon when prison regulations "unjustifiably obstruct", "infringe", "unreasonably burden", or "significantly interfered" with the detainee's access to counsel. *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir.2001)(citations omitted). He argues that "[a]t the Hartford Correctional Center ("HCC"), the professional visit rooms are not soundproof. In fact, it took over a week to schedule a legal phone call from HCC." (sic).

There is nothing on the record establishing Mr. Roman's right to counsel was obstructed, infringed, unreasonably burdened, or significantly interfered with unjustifiably amid the lethal pandemic. He points to no mode or method by which access to counsel could have been increased or by which it was unnecessarily delayed or shortened. Mr. Roman does not cite any source to establish that the

professional visit rooms at HCC are not soundproof or how that deficiency could have been rectified and by when. Nor has he alleged that he requested an alternative means of communicating with Mr. Roman and that the request was unreasonably denied. Nor can the Court conclude that the one-week delay in scheduling a legal call was unreasonable, particularly given current pandemic conditions which preclude in-person professional meetings for inmate, staff, and attorneys' safety. Mr. Roman has not advanced any argument for actual or anticipated prejudice as the result of the minimal and reasonable intrusion into the timing of his communication with counsel.

## Conclusion

For the reasons above, the Court DENIES Mr. Roman's motion for pre-trial release.

                                        IT IS SO ORDERED.

                                        _____/s/_____

                                        Hon. Vanessa L. Bryant
                                        United States District Judge

Dated at Hartford, Connecticut: February 1, 2021