UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | No. 20-CR-253-2 (VLB) |
| : | |
| ISMAEL ROMAN, : | |
| Defendant : | |
| : | |
| : | |
| : | |
| : | |

**DECISION GRANTING DEFENDANT'S MOTION TO SUPPRESS [DKT. 59]**

Before the Court are three motions to suppress filed by Defendant, Ismael Roman. [Dkts. 59, 60, 61]. The Court scheduled an evidentiary hearing for two of the motions [Dkts. 60, 61] for March 2, 2022. In the instant motion, Mr. Roman seeks to suppress evidence seized during a motor vehicle stop. [Dkt. 59]. The Government filed an omnibus opposition [Dkt. 74] and Defendant filed a reply to the Government's opposition [Dkt. 76]. For the following reasons, the Court GRANTS the motion to suppress evidence seized during a motor vehicle stop.

**RELEVANT BACKGROUND**

On December 4, 2020, a criminal complaint was issued against Mr. Roman alleging that he violated 21 U.S.C. §§ 841(b)(l)(A)(ii) and 846 for conspiracy to possess with intent to distribute and distribution of a controlled substance, and 18 U.S.C. §§ 1956(a) and (h) for conspiracy to distribute a controlled substance, money laundering, and conspiracy to commit money laundering. [Dkt. 1 (Compl.)]. Mr. Roman was arrested on December 4, 2020. On December 7, 2020, Mr. Roman

1

appeared before a Magistrate, who ordered his detention without prejudice. [Dkts. 6 and 10 (Minute Entry and Order of Detention)]. On December 15, 2020, a federal grand jury returned an indictment against Mr. Roman and two other co-defendants, Angel Rodriguez and Christopher Walker. [Dkt. 17 (Indictment)]. Mr. Roman is charged under Count One of the Indictment which provides:

> From approximately 2017, through approximately December 4, 2020, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants ANGEL RODRIGUEZ, a.k.a. "Lou Rock," ISMAEL ROMAN, a.k.a. "Poochie" and "Pete," and CHRIS WALKER, and others known and unknown to the Grand Jury, did knowingly and intentionally conspire together and with one another to violate the narcotics laws of the United States. It was part and an object of the conspiracy that the defendants RODRIGUEZ, ROMAN and WALKER, together with others known to the Grand Jury, would distribute and possess with intent to distribute a controlled substance, namely cocaine, in violation of Title 21, United States Code, Section 841(a)(1). The defendants RODRIGUEZ, ROMAN and WALKER knew and reasonably should have foreseen from their own conduct and that of other members of the narcotics conspiracy charged in Count One that the conspiracy involved five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Section 841(b)(1)(A)(ii).

[*Id.* at ¶¶ 1–3.].[1] Mr. Roman has been in custody since his arrest on December 4, 2020. [Dkts. 10 and 51 (Order denying Mot. for Pre-trial Release)].

On May 5, 2021, Mr. Roman filed three motions to suppress. [Dkts. 59, 60, 61]. The Court recounts the following facts from Drug Enforcement Agency ("DEA") Task Force Agent Jeffrey Poulin's affidavit in support of the arrest warrants for Mr. Roman and his co-defendants, and the exhibits attached to the Defendant's Motion—including a DEA Investigation Reports prepared on May 2, 2019, the search warrant for Mr. Roman's and his co-defendants' cell phones, and Mr.

---

[1] Defendant Chris Walker has since been dismissed from the indictment. *See* [Dkt. 81 (Order granting Mot. to Dismiss)

**2**

Roman's affidavit. [Dkts. 1-1 and 59-2 (Poulin Aff. and Ex. A-D, Mot. to Suppress Evid. from Motor Vehicle Stop)].

The Government alleges that co-defendant Rodriguez operated a drug trafficking organization with the assistance of Mr. Roman, former co-defendant Walker, and several unindicted co-conspirators. The drug trafficking organization allegedly obtained multi-kilogram quantities of cocaine from Mexican sources in California for redistribution in Connecticut on a bi-weekly basis. [Dkt. 1-1 ¶¶ 32-33, 45-46, 63]. The Government has been investigating the defendants and co-conspirators since at least January 2018. [*Id.* ¶ 7].

On May 1, 2019, investigators followed Mr. Rodriguez to an apartment complex where they believed that Israel Rivera, an unindicted co-conspirator, maintained a stash house. [Dkt. 1-1 ¶ 17]. A man, later confirmed to be Mr. Roman, arrived at that location driving a gray Acura. [*Id.* at ¶ 18]. Mr. Rodriguez and Mr. Roman entered the apartment building separately and exited together. [*Id.* at ¶ 17-19]. Mr. Roman was carrying a black nylon bag when he exited the building. [*Id.* at ¶ 19]. Mr. Rodriguez drove away but Mr. Roman remained in his vehicle and spoke with Mr. Rivera briefly before also driving away. [*Id.* at ¶ 20].

Prior to Mr. Roman's departure, investigators contacted a marked patrol unit from the Enfield Police Department to assist with the investigation by conducting a motor vehicle stop of the Acura. [*Id.* at ¶ 21., Dkt. 59-2 Ex. B ¶ 14]. As Mr. Roman departed the parking lot and entered the public roadway, Task Force Officer Devanney observed Mr. Roman texting while driving. [Dkt. 59-2 ¶ 15].

Enfield Police Officer Emons stopped Mr. Roman's vehicle and asked Mr. Roman for his license and the vehicle's paperwork. [Dkt. 1-1 ¶¶ 21-23]. Mr. Roman told Officer Emons that it was his cousin's vehicle but they both drove it. [*Id*.]. Mr. Roman consented to the search of his vehicle, which resulted in the discovery of $26,995 in a black draw string bag on the rear passenger side floorboard. [*Id*.] A trained police K-9 arrived on scene and signaled the presence of narcotics odor on the driver's side door handle, the passenger compartment, and the nylon bag. [*Id*. at ¶ 24].

Agent Poulin questioned Mr. Roman during the traffic stop. [*Id*. ¶ 25]. During this questioning, Mr. Roman stated that the money in the nylon bag was for a gambling debt owed to him by "Jose" from a bodega. [*Id.* at 25]. He could not provide any corroborating details and denied knowing Mr. Rivera when confronted with their encounter earlier that day at Mr. Rivera's apartment complex. [*Id*.]. Law enforcement seized the money and Mr. Roman left the scene.

## Discussion

Mr. Roman moves to suppress evidence obtained from a motor vehicle stop, including $26,995 recovered inside a bag, k-9 signals of narcotics odor, and Mr. Roman's statements. Mr. Roman argues that the stop was unconstitutional because the officers did not have reasonable suspicion to stop his vehicle.

A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Whren v. United States*, 517 U.S. 806, 809-10 (1996). An "automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."

*Id.* "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting (*Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Law enforcement officers suspecting criminal activity, may stop vehicles for traffic infractions with the hope of uncovering incriminating evidence. *See United States v. Scopo*, 19F.3d 77 (2d Cir. 1994). The officers' actual motivation is irrelevant. *Whren* 517 U.S. at 813. The stop is valid even if the traffic infraction is merely a pretext. *Id.*

I.     Collective Knowledge Doctrine

Under the collective knowledge doctrine, an officer making a stop may rely on information provided by other law enforcement officials to justify the stop. *See Whitely v. Warden*, 560 U.S. 568 (1971); *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (police lawfully stopped and arrested suspect based on instructions from prosecutor). However, if it is later determined that the officer transmitting the order did not have reasonable suspicion to justify the stop, the stop violates the Fourth Amendment. *See United States v. Hensley*, 469 U.S. 221, 232 (1985) (*Terry* stop based on police flyer indicating suspect was wanted in investigation was legal if "officers who issued the flyer possessed probable cause to make the arrest."); *See also United States v. Colon*, 250 F.3d 130 (2d Cir. 2001) (invalidating stop based on information provided by 911 operator "in the absence of any evidence that the operator made any assessment of reasonable suspicion or was trained to do so").

The Government argues that the stop is justified under the collective knowledge doctrine because TFO Devanney "observed Roman texting/typing on his cell phone while driving his gray Acura." [Dkt. 74 at p. 21]. The Government then states:

> [i]nvestigators enlisted the assistance of an Enfield Police Officer, who conducted a motor vehicle stop of Roman's gray Acura. Based on [TFO Devanney's] observations, investigators plainly had probable cause, let alone reasonable suspicion that Roman had committed a traffic violation.

*Id.*

However, the Second Circuit and other circuits have declined to impute one officers' knowledge on another officer when "there is no evidence that an officer has communicated his suspicions with the officer conducting the search." *See* United *States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) (collecting cases). In *Hussain*, the Second Circuit found that officers' protective search of a vehicle was not justified because the circumstances did not support a reasonable suspicion that the suspects were dangerous, and that the car contained a weapon. *Id.* at 317. Significant to the court's analysis was that part of the justification for the search was one officer's observation that the passenger was sitting in an "unnatural position" that suggested he was trying to hide something, however this observation was never communicated to the searching officer. *Id.* at 316. "Absent record evidence that [the observing officer] communicated his suspicion or any relevant information to [the searching officer] before the latter began to conduct the protective search, we will not impute his knowledge or reasonable suspicion to [the searching officer] under the doctrine of collective knowledge." *Id.* at 316 n.8.

6

The Second Circuit cited to *United States v. Shareef* where the Tenth Circuit also declined to extend the collective knowledge doctrine to officers at the scene who had not communicated with each other. 100 F.3d 1491, 1503 (10th Cir. 1996). The court in *Shareef* stated that:

> [I]n assessing the justification for an investigatory stop, we look to the knowledge of all the police involved in the criminal investigation. However, this concept has limits. The cases in which we have applied the collective knowledge rule all have involved actual communication to the arresting officer of either facts or a conclusion constituting probable cause, or an arrest order.

*Id.*

The Fourth Circuit's decision in *United States v. Massenburg* is also instructive. In *Massenburg*, police officers responding to a report of shots fired observed four men walking on a sidewalk. 654 F.3d 480, 482-83 (4th Cir. 2011). The men voluntarily paused to speak with the officers and at least two of them consented to a pat down, however the defendant refused to consent. *Id.* An officer frisked him and recovered a firearm from his jacket. *Id.* At the suppression hearing, another officer at the scene testified that he had seen a bulge in the defendant's jacket pocket prior to the frisk but did not alert the frisking officer. *Id.* Like the Second and Tenth Circuits, the Fourth Circuit also declined to extend the collective knowledge doctrine to this situation because the officer never conveyed his observation to the frisking officer. *Id.*

In this case, there is no evidence that TFO Devanney ever conveyed "either facts or a conclusion constituting probable cause" to the Enfield Police Department. *See Shareef*, 100 F.3d 1491 at 1503. The DEA Report of Investigation prepared on May 2, 2019 states:

7

> [p]rior to [Mr. Roman's] vehicle departing [the apartment complex], investigators had contacted a marked patrol unit from the Enfield Police to assist with a motor vehicle stop of the Acura. Additionally, upon driving from the lot of [the apartment complex] and entering the public roadway TFO Devanney observed that Roman was texting on his cell phone and driving.

[Dkt. 59-2 at ¶ 14]. Based on this report, TFO Devanney did not observe Mr. Roman commit a traffic infraction until after he called the Enfield Police Department. Though TFO Devanney subsequently developed reasonable suspicion to stop Mr. Roman, there is no evidence on the record that TFO Devanney's observation of Mr. Roman texting while driving was conveyed to Officer Emons.

The Government cites to Judge Hall's decision in *United States v. Conley* to support the contention that the collective knowledge doctrine applies here. [Dkt. 74 at pp. 21-22]. In *Conley*, like in this case, a team of investigators conducting surveillance on the defendant called local police officers and asked them to initiate a traffic stop. 342 F. Supp.3d 247, 244-48 (D. Conn. 2018). However, *Conley* is distinguishable from the present case because the surveillance team in *Conley* developed reasonable suspicion to stop the defendant prior to ordering the traffic stop. *Id.* at 261. Thus, the court found that the surveillance team's knowledge could be imputed on the stopping officers. *Id.* The Government does not address this distinction, nor do they counter the timeline set forth in the DEA Report. Therefore, the Court finds that TFO Devanney's knowledge of the traffic infraction cannot be imputed on Officer Emons. The Government does not allege any other basis for the traffic stop, so, without such knowledge, Officer Emons did not have reasonable suspicion to stop Mr. Roman's vehicle.

8

## II. Fruit of the Poisonous Tree

The exclusionary rule applies to evidence obtained as a result of an unlawful search. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). "[T]angible physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal detention," are considered "fruits of the poisonous tree" and are inadmissible at trial. *United States v. Crews*, 445 U.S. 463, 470 (1980); *see also United States v. Babwah*, 972 F.2d 30, 34 (2d Cir. 1992) (suppressing evidence obtained from consent to search obtained during illegal detention); *United States v. Fisher*, 702 F.2d 372, 379 (2d Cir. 1983) (suppressing out-of-court show up of defendant during illegal arrest).

Since the officers who stopped Mr. Roman's vehicle did not have reasonable suspicion, all evidence obtained from the unlawful stop must be suppressed, including the bag containing $26,955, the k-9s signaling the presence of narcotics, and Mr. Roman's statements.

## EVIDENTIARY HEARING

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)). "[A] defendant seeking to suppress evidence bears the burden of demonstrating disputed issues of fact that would justify an evidentiary hearing." *United States v. Diaz*, 303 F.Supp.

2d 84, 93 (D. Conn 2004) (citing *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969)). Further, a defendant seeking a hearing must submit "an affidavit of someone alleging personal knowledge of the relevant facts." *United States v. Barrios*, 210 F.3d 355, (2d Cir. 2000) (citing *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967)).

Here, there are no contested issues of fact that might justify an evidentiary hearing. The DEA report provided as an exhibit to the Motion to Suppress lays out the timeline of the events leading up to the stop. The Government does not contest the sequence of events establishing that the officers who conducted the motor vehicle stop were not informed that Mr. Roman was texting while driving and that they did not personally observe any basis to stop Mr. Roman's vehicle. Therefore, an evidentiary hearing is not required.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress is GRANTED.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 22, 2022